# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## November 20, 2019 Session

## STATE OF TENNESSEE v. GLENN FRED GLATZ

**Appeal from the Circuit Court for Sevier County**
**No. 23369-II    James L. Gass, Judge**

---

## No. E2019-00431-CCA-R3-CD

---

The defendant, Glenn Fred Glatz, appeals his Sevier County Circuit Court jury convictions of attempted sexual exploitation of a minor and contributing to the delinquency of a minor, arguing that the evidence was insufficient to support his convictions and that the trial court erred by admitting certain testimony into evidence. Because the evidence was insufficient to support the defendant's conviction of attempted sexual exploitation of a minor, that count is reversed, and the charge is dismissed. We affirm the defendant's conviction of contributing to the delinquency of a minor.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part; Reversed and Dismissed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. THOMAS T. WOODALL, J., filed a separate concurring opinion.

Edward C. Miller, District Public Defender (on appeal); and Alexandra Deas-McMahan, Assistant District Public Defender (at trial), for appellant, Glenn Fred Glatz.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; James B. Dunn, District Attorney General; and Ron C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Sevier County Grand Jury charged the defendant by presentment with one count each of attempted sexual exploitation of a minor, violation of the sex offender registration requirements, and contributing to the delinquency of a minor. Upon the defendant's motion, the trial court severed the sex offender registration violation charge, and the defendant proceeded to trial on the two remaining counts.

At the September 2018 jury trial, J.G.,[1] the mother of the victim, testified that at the time of the offenses, the victim, K.G.,[2] was 12 years old. On the night of June 27, 2017, J.G. was asleep, and the victim's father, L.G., was at work. J.G. stated that, at approximately 2:00 a.m., L.G. called to tell her that their 13-year-old son, N.G., had called him about the victim's being out of the house. When J.G. went to check on the victim, the victim was not home. J.G. called and texted the victim's cellular telephone, and the victim responded approximately 45 minutes later. J.G. learned that the victim was on Kathy Drive in Kodak, which J.G. estimated was eight miles from her house. J.G. contacted the police and went to the victim's location at approximately 3:00 a.m., where she found the victim "standing next to a mini storage unit at the end of the road." Although the victim had no visible signs of injury, law enforcement officers directed J.G. to take the victim to the hospital. J.G. provided the police with the victim's clothing. At the hospital, the victim refused to submit to a vaginal exam.

During the time that the victim was gone from the house, J.G. visited a website called "Deviant Art," which she described as a site of "fan fiction based on movies, television, and books, artwork that people had created off of other people's published works." On that website, J.G. found the defendant's name, and she learned that the defendant's postings on the site had been "banned for violating community standards."

J.G. stated that she knew that the victim had a cellular telephone, but the night of the incident she learned that the victim actually had two cellular telephones.

During cross-examination, J.G. stated that she found the victim's second cellular telephone in the victim's bedroom. She discovered the Deviant Art website through a Google search. J.G. said that when she found the victim on Kathy Drive, the victim was alone. At the time, J.G. was unaware of the victim's having any friends on Kathy Drive, but she later learned that the victim did have a friend who lived there.

On redirect examination, J.G. stated that she did not know the defendant and that the victim did not ordinarily travel to other neighborhoods.

---

[1]     It is the policy of this court to refer to minor victims and their family members by their initials.

[2]     In count one of the indictment, the victim is identified as "K.G." In count three of the indictment, the victim is identified as "K.N. DOB: 9/1/2004." In the trial transcript, the victim's first and last names are spelled with a "C" and "G" respectively. It is clear from the record that only one victim is identified in this case. Accordingly, we will use the initials K.G. as used in count one of the indictment.

During recross-examination, J.G. said that in June 2017, her children were never left at home alone.

Sevier County Sheriff's Department ("SCSD") deputy Christopher Cleveland testified that he responded to a call for an "[u]nruly juvenile" that "had snuck out." On cross-examination, Deputy Cleveland described the victim as seeming scared and the victim's parents as "upset" and "sad."

SCSD Deputy Alex Watts responded to Deputy Cleveland's request for assistance, and he similarly described the victim as appearing "upset" and the victim's parents as "[a]ngry and upset" over the incident.

SCSD Detective Tony Tarwater investigated this case and stated that he was familiar with the defendant and had been to the defendant's residence "a time or two" prior to this case. Detective Tarwater described the defendant's residence as "a little pull camper" that was approximately 20-30 feet long and located in "a little field right there next to a mobile home park." He described the specific location as a place with "just campers at the lake." In his prior visits to the defendant's home, Detective Tarwater had seen "some computer equipment" and a "web cam," but he stated that he did not know if the equipment "was surveillance or what have you." Detective Tarwater also noted that the defendant's home was in "a little bit [of] disarray" with "toys, [and] stuffed animal-type things there." Detective Tarwater did not know of any children or other residents living with the defendant. Detective Tarwater estimated that the defendant's home was "probably a good [15] minutes at least" from the victim's house.

As part of his investigation, Detective Tarwater took photographs of the defendant's pickup truck. The photographs, taken at the defendant's residence, showed a banana peel on the ground outside the driver's side door of the defendant's truck and a plastic popsicle wrapper and a roll of duct tape lying in the driver's side floorboard. Detective Tarwater described the defendant's truck as "cluttered" with "stuff in the back."

During cross-examination, Detective Tarwater described the campground where the defendant lived as being occupied "about half and half" by people who lived there year-round and others who stayed week to week. Detective Tarwater acknowledged that one of the photographs showed duct tape on the driver's side of the defendant's truck.

SCSD Detective Ronnie Coleman took the defendant's statement during the investigation. He read the defendant's statement to the jury:

"Called about 8:00, wanting to ride to Lucy's house. Said okay to ride from her house on Providence Hill Road, Lot 2, she said. Then called back about 10:00, said she was ready to pick her up at her house. Pulled up to the house. She, [the victim], was in driveway. I had – I see bananas and Skittles and offered her some. She said no. Drove directly to Kathy Drive and Tom Drive and let her out. She asked for a ride home but canceled and said she didn't need ride home."

Detective Coleman identified a property receipt for the victim's clothing that was collected during the investigation. The victim's clothing was later returned to her father.

On cross-examination, Detective Coleman acknowledged that the victim had initiated contact with the defendant and that the victim contended that the defendant never touched her.

During redirect examination, Detective Coleman said that he had seen screenshots of text messages between the defendant and the victim, which messages referenced the defendant's "taking pictures of [the victim] and meeting her."

On recross-examination, Detective Coleman stated that he began the investigation when J.G. notified him of the text messages between the victim and the defendant. Detective Coleman could not recall whether the text messages had any identifiers as to the person sending each message.

The victim testified that she was 12 years old at the time of the offenses. She was familiar with the defendant and had visited him twice at his home prior to the present incident. She had been introduced to the defendant by two friends, Shelby and Nate.[3] While at the defendant's home, the victim and Shelby "would play with puppies, and we made pancakes." The victim described the defendant's residence as "an odd setup" that was "organized weirdly"; the defendant had "a bunch of stuffed animals on the couch." The victim stated that the defendant had taken "two pictures with me and Shelby" using his camera phone. One picture was taken outside of the defendant's home, and the other was taken while the victim sat on the couch. The victim said that the defendant also took photographs of her with the puppies. The victim told the defendant how old she was when she first met him.

---

[3]     Shelby and Nate's last names are not provided in the record.

At her first visit to the defendant's home, Nate introduced the victim and Shelby to the defendant, and then Nate left. The victim said that Shelby was approximately 13 years old at the time and was unrelated to the defendant. Shelby was also with the victim during her second visit to the defendant's home. After these two visits, the victim told the defendant that she would not be returning. Although she did not tell the defendant why, the victim stated that she did not want to go back to the defendant's home "[b]ecause I had noticed that the pictures he had taken were awfully close to private parts."

The victim stated that, approximately "a week or two" after first meeting the defendant, she contacted the defendant late in the day and asked him to give her a ride to her friend Louis'[4] house. She contacted the defendant by text message via Skype. The victim stated that a few days prior to asking the defendant for a ride, she noticed that the defendant had added her as a contact on Skype, and the victim "added him back." At that point, the victim messaged the defendant, and he responded within a few minutes. The victim said that the defendant knew her first and last names when he added her as a Skype contact. Prior to the defendant's adding her as a contact, the defendant had not discussed Skype with the victim or asked whether she had an account. On June 27, when the victim asked the defendant for a ride, he arrived to pick her up within 30-40 minutes. The victim said that her mother was sleeping and that her father was at work at the time. The victim's brother gave her permission to leave the house, but she did not tell her brother what she was doing. The victim acknowledged that her brother did not have the authority to give her permission to leave the house.

When the victim got into the defendant's vehicle, which the victim described as "a red truck with . . . white lines in the middle," the defendant "offered [her] a banana and a Popsicle," but the victim declined them because she "wasn't hungry" and "was nervous." The defendant drove the victim to Louis' neighborhood, and the victim got out of the vehicle. The defendant told the victim "bye" but did not comment on her appearance or compliment her in any way. The victim maintained that the defendant did not touch her.

The victim stated that she planned to text the defendant for a ride back home, noting that she had the defendant's telephone number. The victim met Louis "at the end of the driveway" and stayed for only "a few seconds" before deciding "to walk the neighborhood" alone. While the victim was walking, J.G. contacted her, and she immediately responded. The victim told J.G. where she was, and J.G. came to get her.

---

[4]    Louis' last name is not provided in the record.

The victim told J.G. what had happened, spoke with law enforcement officers, and was taken to the hospital. The victim stated that she refused an exam at the hospital.

The victim acknowledged that she did not have her parents' permission to leave the house. She explained that she reached out to the defendant for a ride despite having decided not to see him anymore "because I wanted to see my friend for the last time because I was planning on killing myself."

On cross-examination, the victim testified that, on the night of the incident, her brother helped her open the front door to leave the house because she could not open it quietly. The victim said that the defendant took her directly to Louis' house as she had asked. The victim stated that she did not feel that the defendant was being disrespectful of her at any time.

The State rested, and after a *Momon* colloquy, the defendant elected not to testify, and he put on no proof.

Although instructed on the two principal counts as charged and the lesser included offense of attempt to contribute to the delinquency of a minor, the jury returned a guilty verdict for "all three counts." The court determined that the jury had found the defendant guilty of both the primary charge of contributing to the delinquency of a minor and the lesser included charge of attempt. Because the defendant could not be convicted of both the primary charge and the lesser included charge, the court determined that only the conviction for the primary charge would stand.

After a sentencing hearing, the trial court sentenced the defendant to an effective sentence of two years' incarceration as a Range I offender.

Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence at trial was insufficient to support his convictions and that the trial court committed plain error by allowing the victim to testify to a prior incident in which the defendant photographed her.

*I. Sufficiency of the Evidence*

The defendant contends that the evidence adduced at trial was insufficient to support his convictions for contributing to the delinquency of a minor and attempted sexual exploitation of a minor. Specifically, the defendant asserts that the State failed to prove that a delinquent act occurred or that the defendant attempted to photograph the

victim engaged in or simulating a sexual activity. The State argues that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

### A. Attempted Sexual Exploitation of a Minor

As relevant to this case, a person commits the offense of sexual exploitation of a minor when he "knowingly possess[es] material that includes a minor engaged in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." T.C.A § 39-17-1003(a). The code defines "sexual activity" as

(A) Vaginal, anal or oral intercourse, whether done with another person or an animal;

(B) Masturbation, whether done alone or with another human or an animal;

(C) Patently offensive, as determined by contemporary community standards, physical contact with or touching of a person's clothed or unclothed genitals, pubic area, buttocks or breasts in an act of apparent sexual stimulation or sexual abuse;

(D) Sadomasochistic abuse, including flagellation, torture, physical restraint, domination or subordination by or upon a person for the purpose of sexual gratification of any person;

(E) The insertion of any part of a person's body or of any object into another person's anus or vagina, except when done as part of a recognized medical procedure by a licensed professional;

(F) Patently offensive, as determined by contemporary community standards, conduct, representations, depictions or descriptions of excretory functions; or

(G) Lascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person.

T.C.A § 39-17-1002(8). "'Patently offensive' means that which goes substantially beyond customary limits of candor in describing or representing such matters[.]" *Id.* § 39-17-1002(4).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense[.]

*Id.* § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

Regarding the defendant's conviction for attempted sexual exploitation of a minor, we agree with the defendant that the evidence adduced at trial was insufficient to sustain the conviction. In the light most favorable to the State, the evidence showed that, on June 27, 2017, the victim texted the defendant and asked for a ride to a friend's house. The defendant picked up the victim at the victim's house and offered her a banana, a popsicle, and some Skittles, all of which the victim declined. The defendant drove the victim directly to her friend's house and dropped her off. The defendant owned a cellular telephone equipped with a camera and had taken photographs of the victim on previous

occasions. The victim testified that she believed at least one prior photograph was "awfully close to private parts." The State contends that the defendant's owning a camera phone, offering the victim food items, and giving the victim a ride late at night rises to the level of attempted sexual exploitation of a minor because he "offered his generosity with an eye toward prurient ends." The defendant's intent, however, is not the test to determine whether certain conduct rises to the level of sexual exploitation of a minor. *State v. Whited*, 506 S.W.3d 416, 449 (Tenn. 2016) (holding that the determination of whether material contains the lascivious exhibition of a minor's body "does not include as an element the accused's subjective intent or purpose of sexual arousal or gratification").

Even if the defendant had offered the banana and popsicle because of their phallic shapes with the intent to photograph the victim eating the foods, as suggested by the State, such a photograph would not depict "sexual activity" as defined by the statute. T.C.A. § 39-17-1002(8). The State argues that the specific sexual activity that the defendant attempted to photograph was the "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." *Id.* § 39-17-1002(8)(G). The mere fact that the defendant had previously taken a photograph that was "awfully close" to the victim's "private parts" is not enough to say that such a photograph would have been lascivious exhibition of the victim's genitals or that the defendant was attempting to take such a photograph on the night in question. Furthermore, the defendant's using the food items to lure the victim into engaging in sexual activity does not constitute a substantial step toward sexual exploitation because the defendant's entire course of action did not corroborate the intent to commit such an offense. *See* T.C.A. § 39-12-101(b). The defendant drove the victim directly to the location that she requested, which conduct belies the State's theory that he intended to do anything other than give the victim a ride. Additionally, the State offered no evidence that the defendant had his camera phone with him or that he intended to photograph the victim that night. Consequently, the defendant's conviction for attempted sexual exploitation of a minor is reversed, and that charge is dismissed.

### B. Contributing to the Delinquency of a Minor

As relevant here, a person commits the offense of contributing to the delinquency of a minor by

> aiding or abetting or encouraging the child in the commission
> of an act of delinquency or unruly conduct or by participating
> as a principal with the child in an act of delinquency, unruly
> conduct or by aiding the child in concealing an act of

delinquency or unruly conduct following its commission[.]

T.C.A. § 37-1-156(a)(1). A "delinquent act" is

> an act designated a crime under the law, . . . and the crime is
> not a status offense under subdivision (b)(24)(C) and the
> crime is not a traffic offense as defined in the traffic code of
> the state other than failing to stop when involved in an
> accident pursuant to § 55-10-101, driving while under the
> influence of an intoxicant or drug, vehicular homicide or any
> other traffic offense classified as a felony[.]

*Id.* §37-1-102(b)(10) (2016). Although "unruly conduct" is not defined in the Code, an
"unruly child" is

> a child in need of treatment and rehabilitation who:
>
> (A) Habitually and without justification is truant from
> school while subject to compulsory school attendance under §
> 49-6-3007;
>
> (B) Habitually is disobedient of the reasonable and
> lawful commands of the child's parent(s), guardian or other
> legal custodian to the degree that such child's health and
> safety are endangered;
>
> (C) Commits an offense that is applicable only to a
> child; or
>
> (D) Is away from the home, residence or any other
> residential placement of the child's parent(s), guardian or
> other legal custodian without their consent. Such child shall
> be known and defined as a "runaway".

*Id.* § 37-1-102(b)(24) (2016).

Here, the State's evidence established that the victim contacted the
defendant and asked him for a ride from her house to a friend's house on the night of
June 27, 2017. The victim did not have her parent's permission to leave the house. The
defendant picked up the victim at her house as planned and drove her to her friend's

house.  This evidence was sufficient to support a finding that the defendant contributed to the victim's unruly act of being away from home without her parents' permission.

## II.  Plain Error in Admission of Evidence

Although we have reversed the defendant's conviction for attempted sexual exploitation of a minor, we will review the evidentiary issue to facilitate any further appeal.  The defendant asserts that the trial court erred by allowing the victim to testify that the defendant had previously taken a photograph that was near her private parts.  The defendant acknowledges that he failed to raise the issue in his motion for new trial, but he argues that the issue warrants plain error review.

As the defendant acknowledges, because he failed to lodge a contemporaneous objection to the victim's testimony and because he failed to include the issue in his motion for new trial, the issue is waived.  *See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 3(e).  That being said, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."  Tenn. R. App. P. 36(b).  This court will grant relief for plain error pursuant to Rule 36(b) only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake.

*State v. Cooper*, 321 S.W.3d 501, 506 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)).

The defendant contends that the victim's statement regarding the prior photograph was admitted in violation of Tennessee Rule of Evidence 404(b).  *See* Tenn. R. Evid. 404(b).  Although evidence of prior bad acts is inadmissible to show "action in conformity with the character trait," the evidence "may, however, be admissible for other purposes," *id.*, but only "if relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect," *State v. Wyrick*, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001).  Other purposes for which the evidence may be admissible include "issues such as identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake."  Tenn. R. Evid. 404(b), Advisory Comm'n Comments.  The State argues that the victim's statement was

-11-

admissible to show the defendant's intent to photograph the victim on the night in question. Although intent is not an element of sexual exploitation of a minor, to secure a conviction of attempt of that offense, the State was required to prove the defendant's intent to commit the crime. *See* T.C.A. § 39-12-101(a)(3). Because the victim's statement may have been admissible under 404(b) to show the defendant's intent, we cannot say that a "clear and unequivocal rule of law" was breached, and, consequently, the issue does not warrant plain error review. *See Cooper*, 321 S.W.3d at 506.

Accordingly, we affirm the defendant's conviction of contributing to the delinquency of a minor, but we reverse his conviction of attempted sexual exploitation of a minor and dismiss that charge.

_____
JAMES CURWOOD WITT, JR., JUDGE